IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 16, 2006

## STATE OF TENNESSEE v. JOEL KEENER

**Direct Appeal from the Circuit Court for Warren County**
**No. F-9282        Larry B. Stanley, Jr., Judge**

---

**No. M2005-01923-CCA-R3-CD - Filed July 13, 2006**

---

The Defendant, Joel Keener, was convicted of facilitation of the manufacture of methamphetamine, and the trial court sentenced him, as a Range II offender, to eight years in prison. On appeal, the Defendant contends: (1) that the evidence is insufficient to sustain his conviction; and (2) that the trial court erred when it sentenced him. Finding that there exists no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

Phillip T. Clemons, McMinnville, Tennessee, for the appellant, Joel Keener.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Dale Potter, District Attorney General; Larry Bryant, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from evidence discovered as a result of the execution of a search warrant for the search of a home located in Warren County. As a result of the execution of this search warrant, the Defendant was indicted on charges that he manufactured methamphetamine, possessed drug paraphernalia, and was a felon in the unlawful possession of a weapon. At the Defendant's trial on these charges, the following evidence was presented: Tony Jenkins, a detective with the McMinnville Police Department, testified that, on October 25, 2002, he and another detective, Mike Vann, went to 115 Morningside Drive to get the contents of the trash can. He said that he and Detective Vann took the contents to another location to search for mail and discarded items used in the manufacture of methamphetamine. Detective Jenkins agreed that, based on what they found and other observations made at this address, he obtained a search warrant for the address on October 28,

2002.

Detective Jenkins testified that he participated in the execution of the search warrant on October 29, 2002. When they got to the house a woman named Deana Tate, who lived in the home, answered the door. The detective entered the home and saw the Defendant moving around under the bedcovers. Detective Jenkins ordered the Defendant to show his hands, but the Defendant would not show his hands. The detective pulled the bedcovers off of the Defendant and took him into custody.

On cross-examination, the detective agreed that he did not recall finding any tubing or coffee filters at the house. He also did not find any Ephedrine or Pseudoephedrine pills. The detective was unsure whether several other items that he was asked about were found in the home, and he agreed that some of these items were common items to be found around a methamphetamine laboratory. The detective said that he did not find any bills or receipts from chemical companies or any unused baggies. The detective conceded that he did not find any methamphetamine residue, large quantities of cash, or any cutting agents. Detective Jenkins also conceded that he did not know whether the Defendant was at the house on the night that the detective searched the trash. The detective had, however, seen the Defendant at this residence once or twice prior to the date that the search warrant was executed. Detective Jenkins did not find anything in the trash can listing the Defendant's name.

Detective Jenkins said that he found a handgun in the same room as the Defendant, but it was not on the Defendant's person. He said that he did not fingerprint the handgun to see if the Defendant had ever handled the gun. Therefore, he agreed that he could not say for sure whether the Defendant touched the gun. The detective agreed that Deana Marie Tate claimed that the handgun belonged to her deceased ex-husband, and he said that the gun was located between the wall and the bed, which was within the Defendant's reach.

The detective said that he found no consumable or marketable methamphetamine at the residence. He testified that no methamphetamine could have been produced from what he found at the residence when he executed the search warrant. Detective Jenkins did find red phosphorus in the Defendant's pant's pocket. The detective said that he arrested the Defendant, and he agreed that he was "up close" with the Defendant. He testified that he did not see any sores on the Defendant's hands, but he did see iodine stains on them. The detective agreed that he did not recall finding any drug paraphernalia, pipes, rolling papers, or needles on the Defendant. Detective Jenkins testified that there was no proof that the red phosphorus in the Defendant's possession was processed at the house where the search warrant was executed. Further, the detective agreed that there was not an odor of "fresh cooked methamphetamine" at the house, but his eyes and throat did burn while he was at the home as if methamphetamine had been cooked there in the last few days.

On redirect examination, Detective Jenkins testified that of the sixty to seventy methamphetamine labs that he has discovered while in law enforcement he found large sums of money at only two of them. Further, he said that, based on his training and experience, the substance found in the Defendant's pocket was red phosphorus and that red phosphorus is one of the

ingredients used to manufacture methamphetamine. Detective Jenkins testified that he thought that methamphetamine had been manufactured in the residence somewhere between October 25th and 29th, before the search warrant was executed.

Mike Vann, a detective with the McMinnville Police Department, testified as an expert in the area of investigation of clandestine methamphetamine laboratories that he was involved in the investigation of this case. He said that he assisted Detective Jenkins in a "trash pull" on October 25, 2002, to look for evidence of illegal drug activity. In the trash, the detective found empty chemical containers, old filters, and other items that led him to believe that something illegal was occurring in the house. Detective Vann said that, based on the evidence found in the trash, Detective Jenkins obtained, and they both executed, a search warrant of the home. The detective said that when he investigates methamphetamine laboratories he looks for ephedrine or pseudoephedrine, iodine or iodine crystals, and red phosphorus. The detective said that obtaining the red phosphorus from matchbooks is labor intensive, but it is a key ingredient in the manufacture of methamphetamine. Detective Vann listed multiple other ingredients used in the manufacture of methamphetamine and said that he does not always find all of these at every methamphetamine laboratory that he discovers. He said that, sometimes, they arrive after the methamphetamine has been produced so you only find some, and not all, of the necessary ingredients.

The detective identified multiple pictures of the home, including one that depicted a handgun that was found underneath the bed lying against the wall. He agreed that this gun was found underneath the bed in the bedroom where the Defendant was when they executed the search warrant. Detective Vann indicated that the Defendant could have leaned over the side of the bed and been able to reach the gun. Also in that room, the detective found a jar wrapped in tape that contained iodine crystals, a "true laboratory flask," a set of scales, a propane torch, two baggies, a small plastic white translucent looking container, a blister pack that is commonly used to package cold medicines, and a propane camp stove. The detective said that all of these items were significant in that they could be used in the manufacture of methamphetamine.

Detective Vann testified about the items that he found in the trash on October 29, 2002, the day the search warrant was executed. He said that he found what he would consider "meth trash," which included empty blister packs of over-the-counter cold medicine, charcoal lighter fluid, empty containers, Heet gas treatment, which contains methyl alcohol that is used to separate the pills, and several filters. Additionally, he found an HCL generator, which is commonly used in the manufacture of methamphetamine. In a city trash can, the detective found coffee filters that contained red phosphorus, coke bottles that had been cut off as if to be used as funnels, an empty box of Sudafed, and tubing. Detective Vann also found a glass tube similar to those used commonly to ingest methamphetamine. The detective also identified a photograph depicting the iodine stains on the Defendant's hands. He said that, commonly, he looks for iodine stains on a person's hands that he suspects of manufacturing methamphetamine.

On cross-examination, the detective agreed that he did not see the Defendant on October 25, 2002, the day that they did the "trash pull," and he did not find any evidence that day that would link

the Defendant to a methamphetamine laboratory. Detective Vann testified that on the day that he executed the search warrant he did not find any matches, lye, or brake cleaner, and he did not find any ephedrine or pseudoephedrine, acid, tubing, or aluminum foil inside the home. He also did not find evidence that the Defendant processed the red phosphorus that was in his possession. The detective conceded that methamphetamine could not be made from iodine crystals, red phosphorous, and Coleman fuel alone. Detective Vann testified that he did not take fingerprints from the glass flasks or the handgun found in the room with the Defendant. The detective testified that he did not find any methamphetamine at the house, and he agreed that there was nothing wrong with owning some of the items that he found in the house. The detective agreed that the trash can did not have a lock on it and that it was possible that someone else put the trash in the trash can. He agreed that a person would have to have lye in order to produce methamphetamine. Detective Vann testified that he noticed the odor of methamphetamine when he entered the house, but the odor was not strong. He agreed that he also did not find any cutting agents, large amounts of cash, or any records or ledger books relating to the illegal distribution of methamphetamine.

Jason Rowland, an investigator employed with the District Attorney's Office and the Drug Task Force, testified that he participated in the execution of this search warrant. Shortly after the warrant was executed, he and another detective went back to Rowland's office to interview the Defendant. Rowland said that he read the Defendant his rights, and the Defendant waived those rights. Rowland then identified a videotaped interview with the Defendant, and it was played for the jury.

In the interview, much of which was unintelligible, the Defendant said that he had stayed at the home that was searched "off and on" for two or three months and that he and Tate sometimes dated. The Defendant said that he tried to keep the home clean and so he had cleaned out mason jars and picked up coffee filters, but he did not know how they had been used. He said that he knew the ingredients for cooking methamphetamine, but he did not know that anyone was cooking it in the house. The Defendant said that he did not know that there was anything in his pockets and that someone must have planted this evidence on him. He said that he had bought iodine for a person three or four weeks ago, but he refused to say whom he bought the iodine for because that person had traded the iodine for drugs. The Defendant denied knowing that there was a gun in the room in which he was found, saying that he had just pulled back the covers and gone to sleep in the room but had never looked around. He denied that the stains on his hands were from iodine and explained that he thought they were grease stains from working on Tate's car. The Defendant then admitted that, one time, a man named "Charles" came to the house and cooked methamphetamine, and he thought that maybe it was two or three days ago. He admitted that he went to Target and other stores near Murfreesboro to purchase chemicals that were needed for the cooking process. He said that he did not stay in the room when "they" cooked methamphetamine and that "they" brought him some methamphetamine after "they" finished cooking.

On cross-examination, Rowland said that it was not illegal to purchase iodine, matches, or cold pills. He said that the Defendant told him that he took a "quarter," presumably of a gram, of methamphetamine per week, and Rowland agreed that a quarter is a small amount.

The parties stipulated that the Defendant had a prior felony drug conviction.

Deana Marie Tate testified that she lived at the house that was searched by police, and she had picked up the Defendant at his mother's house during the evening prior to the search. Tate said that, at the time, the Defendant lived with his mother and not with her. She said that he stayed at her house approximately four or five nights per week at the most, and she had known him for about one month. Tate said that the Defendant was a "real druggy" at this time and that he smoked a lot of pot. She said that when she went to get the Defendant he was "groggy," and as soon as they got to her house he went to sleep. Tate said that she left the house and did not return until somewhere between 11:00 p.m. and 1:00 a.m. She checked on the Defendant, and he was still asleep. Tate testified that she did not tell the Defendant that there was a methamphetamine laboratory in her home, and there was not an agreement between the Defendant and her to manufacture methamphetamine. Tate said that the Defendant never bought pills or iodine, but Tate did, and the Defendant had no idea what was happening. Tate testified that she "guess[ed]" that the two guns that were at the house belonged to her. Tate identified the photograph previously entered of some iodine stains on hands. She said that the hands depicted in that photograph were hers and that she had iodine stains and burns on her hands.

On cross-examination, Tate testified that, at the time of this incident, she was using methamphetamine fairly heavily. She indicated that, therefore, her memory of this particular time was incomplete. Tate said that she put the gun underneath the bed in the room where the Defendant was sleeping after her husband was killed. She testified that the last time that she manufactured methamphetamine in her home was approximately two weeks prior to the search. She agreed that she would make some of the methamphetamine at her house and then take it somewhere else to finish the cooking process.

On redirect examination, Tate agreed that she pled guilty to owning all of the items found by police. She said that everything in the house was hers and not the Defendant's. Further, the Defendant never helped her make methamphetamine.

Based upon this evidence, the Defendant was convicted for the facilitation of the manufacture of methamphetamine, a Class D felony. At a subsequently held sentencing hearing the following evidence was presented: The State told the trial court that it filed a notice that the Defendant was a Range II offender based upon two previous convictions. It then asserted that the Defendant had two other convictions and that he was on probation when this incident occurred. Donna Dunlap, with the Department of Correction Probation and Parole, testified that she was assigned to prepare a pre-sentence investigation in this case. She said that the Defendant's prior record showed that he pled guilty in March of 2002 for the manufacture of methamphetamine and was sentenced to five years probation after serving 180 days. Dunlap testified that the Defendant did not successfully complete probation, and she said that he may still be serving the violation of probation time at the time of the sentencing hearing.

Additionally, Dunlap testified that in December of 2001 the Defendant was convicted for marijuana possession and was sentenced to probation. Dunlap thought that the Defendant had violated the terms of that probation. In May of 2001, the Defendant was convicted of burglary, and he was sentenced as a Range II Offender. In February of 2000, the Defendant was convicted of attempt to manufacture methamphetamine, received a sentence of two years probation, and violated that probation. Further, Dunlap testified that the Defendant was convicted of possession of a weapon with the intent to go armed in February of 1998. She also discussed some other convictions and sentences that the Defendant had received between 1986 and 1997. Upon questioning by the trial court, Dunlap said that the Defendant was on probation at the time that he committed the crime for which he was being sentenced in this case.

The Defendant testified that, while in jail, he has participated in a drug rehabilitation program, and he completed a fourteen-week program that is highly recommended by the probation and parole officers. He seemed to indicate that he has been recommended by correctional officials to go to a lower security annex of the prison facility. The Defendant admitted that he had a drug problem in the past but said that he had learned his lesson. On cross-examination, the Defendant was unsure of whether he was on probation at the time of this offense. The Defendant agreed that he had been convicted of five felonies, including the felony conviction in this case, and he had various other misdemeanor convictions. The Defendant agreed that he violated the terms of one of his probated sentences because he failed a drug screen.

Based upon this evidence, the trial court sentenced the Defendant to eight years in the Department of Correction.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his conviction; and (2) the trial court erred when it sentenced him.

## A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction for the facilitation of the manufacture of methamphetamine because the evidence did not prove that he knew that the owner of the residence was engaged in the manufacture of methamphetamine and because the evidence did not prove that he knowingly furnished substantial assistance in the commission of a felony. The State counters that the evidence presented clearly supports the conviction. When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Goodwin, 143 S.W.3d 771, 775 (Tenn. 2004) (citing State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass,13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (1966) (citing Caroll v. State, 370 S.W.2d 523 (1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. Goodwin, 143 S.W.3d at 775 (citing State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000). However, before an accused can be convicted of a criminal offense based on circumstantial evidence alone, the facts and circumstances "'must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant . . . .'" Id. (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)). "In other words, a web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Id. (citing Crawford, 470 S.W.2d at 613).

The Defendant was convicted of the facilitation of the manufacture of methamphetamine. Facilitation occurs when a person, "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), . . . knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a) (2003). Here, the felony involved is the manufacture of a controlled Schedule II substance, methamphetamine. See Tenn. Code Ann. § 39-17-417(a)(1) (2003) (making it an offense for a defendant to manufacture a controlled substance); Tenn. Code Ann. § 39-17-408(d)(2) (2003) (defining methamphetamine, its salts, isomers, and salts of its isomers as a Schedule II substance). "'Manufacture' means the production, preparation, propagation, compounding, conversion or processing of a controlled substance, either directly or indirectly by extractions from substances of natural origin, or independently by means of chemical synthesis . . . ." Tenn. Code Ann. § 39-17-

-7-

402(15) (2003 & Supp. 2005).

The evidence in this case, viewed in the light most favorable to the State, proves that the Defendant had been staying with Tate, who he sometimes dated, off and on for approximately two or three months. The Defendant was at the home prior to the execution of the search warrant. When detectives executed a search warrant, the smell of methamphetamine was present. The Defendant was found in one of the bedrooms in the home, and he had baggies of red phosphorous, a cooking agent, in his pant's pocket, and iodine stains on his hands. In the room with the Defendant were multiple items that are used in the manufacture of methamphetamine. In other areas of the house the detectives found multiple other items frequently used in the manufacture of methamphetamine. The Defendant admitted that, one time, a man named "Charles" came to the house and cooked methamphetamine, and he thought that maybe it was two or three days prior to the execution of the search warrant. The Defendant went to Target and other stores near Murfreesboro to purchase chemicals that were needed for the cooking process, but he said that he did not stay in the room when they cooked methamphetamine. From this evidence, we conclude that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

The Defendant specifically asserts that the evidence did not prove that he knew that the owner of the residence was engaged in the manufacture of methamphetamine or that he knowingly furnished substantial assistance in the commission of a felony. However, by the Defendant's own admission "Charles" cooked methamphetamine in the home a few days prior to the execution of the search warrant, and the Defendant purchased chemicals to assist in the cooking process. The Defendant is not entitled to relief on this issue.

## B. Sentencing

The Defendant contends that the trial court erred when it sentenced him to the upper limits of the applicable sentencing range. In essence, he asserts that confinement is not necessary to protect society and is not the least severe measure that could have been imposed. He asks this Court to reduce his sentence to the minimum for a Range II offender. The State counters that the record supports the trial court's decision. When it sentenced the Defendant, the trial court found:

[The Defendant] was convicted of Class D felony, facilitation, manufacturing methamphetamine. He is a Range II Offender. That sentence range is four to eight years.

In considering the enhancement factors, there's really only one at this time that we can consider,[1] which is prior criminal activity, prior criminal convictions.

---

[1]We note that, at the time, the case of State v. Gomez, 163 S.W.3d 632 (Tenn. 2005), had not yet been issued, and trial courts were applying enhancement factors in accordance with Blakely v. Washington, 542 U.S. 296 (2004), a case that seemed to indicate that the only properly applied enhancement factors other than a history of prior convictions were those admitted by the Defendant or found by a jury to be applicable.

. . . .

But [the Defendant's] criminal record is extensive. It's just atrocious. It goes on for pages, and I think he's got, as [the Prosecutor] said, five felony convictions now, much more than is necessary to establish the range.

. . . .

So the court is increasing the sentence from the minimum, the range, to eight years. I really don't know that any have been filed, and I don't find any mitigating factors in this particular case. . . .

This . . . offense was committed while [the Defendant] was on probation for another felony, for the . . . conspiracy to manufacture methamphetamine. And therefore this sentence should run consecutive to that . . . particular case.

When a defendant challenges the length and manner of service of a sentence, it is the duty of this court to conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "'conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001) (quoting State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999)); see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court that are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

In conducting a de novo review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the pre-sentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the offense; (f) any mitigating or enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts. So long as the sentencing court followed the appropriate statutory procedure and imposed a lawful sentence after giving due consideration and proper weight to the factors and principles under law, and so long as the sentencing court's findings of facts are adequately supported by the record, then this Court may not modify the sentence, even if it actually prefers a different result. Goodwin, 143 S.W.3d at 783 (citing State v. Pike, 978 S.W.2d 904, 926-27 (Tenn. 1998))

Because our review of the record in this case reveals that the trial court considered the sentencing principles and all relevant facts and circumstances, the aforementioned "presumption of

correctness" is applicable. At the time of the Defendant's sentencing hearing, March 9, 2005, the law mandated that in the absence of enhancement and mitigating factors the presumptive length of a sentence for a Class D felony such as the facilitation of the manufacture of methamphetamine was the minimum sentence in the statutory range. Tenn. Code Ann. § 40-35-210(c) (2003).[2] Where one or more enhancement factors applied but no mitigating factors existed the trial court could sentence above the presumptive sentence but still within the range. Tenn. Code Ann. § 40-35-210(d). Where both enhancement and mitigating factors applied, the trial court was required to start at the minimum sentence, enhance the sentence within the range as appropriate to the enhancement factors, and then reduce the sentence within the range as appropriate to the mitigating factors. Tenn. Code Ann. § 40-35-210(e). The weight afforded an enhancement or mitigating factors is left to the discretion of the trial court so long as the trial court complies with the purposes and principles of the Tennessee Criminal Sentencing Reform Act of 1989 and its findings are supported by the record. State v. Hayes, 899 S.W.2d 175, 185 (Tenn. Crim. App. 1995).

The trial court in the case under submission found that the Defendant was a Range II offender, and the Defendant was convicted of a Class D felony. As such, the Defendant's applicable sentencing range was four to eight years. The trial court found applicable enhancement factor number two, which allows the trial court to adjust a defendant's sentence if, "The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range . . . ." Tenn. Code Ann. § 40-35-114(2)[3] (2003). The trial court gave this enhancement factor great weight when it sentenced the Defendant. The evidence at the sentencing hearing proved that the Defendant had been convicted of three previous felonies, other than those necessary to establish his range, including manufacturing methamphetamine, burglary, and attempt to manufacture methamphetamine. Additionally, the proof showed that the Defendant had multiple misdemeanor convictions, involving other drug convictions and weapons offenses. We conclude that the Defendant has not met his burden of showing that the evidence preponderates against the trial court's sentencing him to eight years based solely upon this enhancement factor.

As further support for our holding, we note that, when the trial court ordered that the Defendant's sentence run consecutively to his sentence from a previous conviction, the trial court found, " This . . . offense was committed while [the Defendant] was on probation for another felony . . . ." This is another applicable enhancement factor pursuant to Tennessee Code Annotated section 40-35-114(13) (2003 & Supp. 2005). The trial court implied that, pursuant to Blakely v. Washington, 542 U.S. 296 (2004), it could not properly apply this enhancement factor. The Tennessee Supreme Court has held that Blakely does not apply to Tennessee's sentencing scheme because "the Tennessee Criminal Sentencing Reform Act does not authorize a sentencing procedure

---

[2]We note that, effective June 7, 2005, this statute was amended, and the portion of the statute that mandated that the presumptive sentence was the minimum in the range was changed. The newly enacted statute mandated that a trial "court shall impose a sentence within the range of punishment determined . . . ." Tenn. Code Ann. 40-35-210 (2003 & Supp. 2005).

[3]We note that, effective June 7, 2005, this enhancement factor is now enumerated in a different section, namely Tennessee Code Annotated section 40-35-114(1) (2003 & Supp. 2005).

-10-

which violated the Sixth Amendment right to jury trial." State v. Gomez, 163 S.W.3d 632, 651 n.16 (Tenn. 2005). As such, the trial court could have properly applied this enhancement factor. Accordingly, the Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, the judgment of the trial court is affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE